SAWYER v. CLEVELAND IRON MIN. CO.

(Circuit Court of Appeals, Second Circuit. May 28, 1895.)

BILL OF LADING—DEFICIENCY IN CARGO.

Defendant's vessel was chartered to carry a cargo of grain in bulk from S. to B. The grain was weighed into the vessel at S. from an elevator, under the supervision of a weighmaster for the elevator, an assistant state weighmaster, and a tally keeper for the vessel; and defendant gave a bill of lading, in accordance with their count, for 81,000 bushels, such bill of lading providing: "All the deficiency in cargo to be paid for by the carrier, * * * and deducted from the freight, and any excess in cargo to be paid for to the carrier by the consignee." Upon arrival at B., it was ascertained that only 79,498 bushels were on board, the difference being due to a mistake in the weighing at S. *Held,* in an action by the assignee of the consignor, that the carrier was liable for the shortage in the cargo, though the grain had never actually been loaded on board the vessel.

In Error to the Circuit Court of the United States for the Northern District of New York.

This was an action by Franklin J. Sawyer against the Cleveland Iron Mining Company upon a bill of lading. Upon the trial in the circuit court a verdict was directed for the plaintiff for $67.03, and judgment was entered accordingly. Plaintiff brings error, claiming a larger sum. Reversed.

Benj. H. Williams, for plaintiff in error.

Franklin D. Locke, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The firm of A. J. Sawyer & Co., of Duluth, Minn., in April, 1890, were the owners of a large quantity of wheat lying in the Great Northern elevator at West Superior, a port close to Duluth. On the 28th of that month, the propeller Frontenac, belonging to the defendant, was chartered by said firm to transport a cargo of wheat from Duluth to Buffalo, N. Y., at a freight of 3¼ cents per bushel of 60 pounds. On the same date, agreeably to instructions, the Frontenac presented herself at the elevator to receive her cargo. The grain was weighed, as it was

loaded, under the superintendence of a weighmaster for the elevator, of the assistant state weighmaster of the state of Minnesota, and of a tally keeper on behalf of the vessel. According to their account, 81,000 bushels were weighed into the vessel, and, believing such count to be correct, A. J. Sawyer & Co. surrendered to the elevator certificates for that quantity of wheat; and the defendant, by its agents, signed three bills of lading, for 40,000, 40,000, and 1,000 bushels, respectively. The bill for 1,000 bushels was to "order A. J. Sawyer & Co., care F. J. Sawyer, Buffalo." The other two were to like order, with the addition, in one case, "Notify H. O. Armour & Co., New York," and, in the other, "Notify Wm. H. Wallace & Co., New York." Upon arrival at Buffalo the cargo of the Frontenac was delivered into Elevator Niagara A, and was found to contain only 79,498 bushels. The referee finds as a fact, and upon sufficient evidence, that the difference—1,502 bushels—was not in fact put on board at West Superior, the weighers there having made a mistake in tallying 81,000 bushels, when there were in fact only 79,498 on board. On a delivery of the cargo to the elevator at Buffalo, the captain of the Frontenac took out warehouse receipts for the 79,498 bushels, and delivered to F. J. Sawyer receipts for 77,773 bushels. The balance—1,725 bushels—was retained and sold to pay an unpaid balance due on account of the freight. The amount so sold overpaid such freight, and it was for the surplus that the circuit court gave plaintiff judgment for $67.03. As no argument has been made upon any assignment of error touching this part of the case, it need not be considered. The only question is as to plaintiff's right to recover for the shortage of 1,502 bushels. One lot, of 40,000 bushels, was to be reshipped at Buffalo by F. J. Sawyer to H. O. Armour & Co., at New York, and was eventually delivered to them. The other lot, of 40,000 bushels, was to be reshipped by F. J. Sawyer to William H. Wallace & Co. at New York, but only 32,000 were delivered to that firm; the matter being adjusted through the medium of a sale by that firm of 8,000 bushels to F. J. Sawyer, acting for and on behalf of A. J. Sawyer & Co. The lot of 1,000 bushels was shipped by A. J. Sawyer & Co. to the plaintiff on consignment to sell the same on their account. Before commencement of the action, plaintiff secured assignments from all three firms, but we concur in the conclusion of the referee that plaintiff thereby acquired no better right to recovery than A. J. Sawyer & Co. had when the shortage was discovered. The wheat was at that time still theirs, and neither of the New York firms had, so far as the evidence shows, advanced anything on the faith of the bills of lading.

The following is the form of bill of lading issued by defendant, the names of consignees and the quantities being as stated above.

"Duluth, Minn., April 28, 1890.

"Shipped in good order and condition by A. J. Sawyer & Co., as agents and forwarders for account and at the risk of whom it may concern, on board the propeller Frontenac, whereof ——— is master, now in the port of West Superior, Wisconsin, and bound for Buffalo, New York, the following property, as here described, to be delivered in like good order and condition as consigned in the margin (the dangers of navigation only excepted), subject to freight

and charges as below. All the deficiency in cargo to be paid by the carrier (except when grain is heated, or heats in transit), and deducted from the freight, and any excess in cargo to be paid for to the carrier by the consignee. In witness whereof, the master, owner, or agent of the said propeller Frontenac hath affirmed to one bill of lading and copies thereof, the original bill of lading being alone negotiable, and the said copies being marked on their face as follows: 'Copy not negotiable.' [Then follow the name of consignee, the statement of the number of bushels, and of the rate of freight, and the signature of defendant's agent.]"

Variances between the amount stated in the bill of lading and the amount actually delivered are not uncommon when the cargo is grain in bulk. The evidence shows that in the 32 instances testified to the shortages ranged from one bushel to 255 bushels, and in still another case the shortage was 827 bushels. In 11 other cases the excess ranged from 2 bushels to 82 bushels.

The only clause in this document which is to be construed is the following:

"All the deficiency in cargo to be paid by the carrier (except when grain is heated, or heats in transit), and deducted from the freight, and any excess in cargo to be paid for to the carrier by the consignee."

Does this mean that deficiency in cargo, however caused, shall be paid by the carrier? Or that such deficiency, be it small or great, shall not be paid by the carrier when it arises from the circumstance that, by mistake in weighing when put on board, the total quantity is stated in the bills of lading as greater than the total quantity actually laden? An ordinary bill of lading is not conclusive between the parties as to quantity shipped. It is open to explanation, like any other receipt. A carrier may, however, agree that he will be bound by the quantity specified, or that the bill of lading shall furnish the only evidence of the quantity. The bill of lading in this case is not in the ordinary form. Probably because of the usual and ordinary variations in quantity, which experience has shown are most frequently to be expected with cargoes of this character between these ports, a clause is added which plainly provides for an adjustment of such deficiency or excess without going back of the face of the bill. Save for the excepted case of grain which is heated or heats in transit, there is nothing in the language used which limits the deficiency or excess so to be adjusted, by the specification of any particular cause. Whether some of it be lost in transit, or whether a change of atmospheric condition increases or diminishes the size of the individual grains, or whether the shape of the measuring receptacles or the individual peculiarities of different weighers produces discrepancies, or whether the carrier drops part of it overboard in the process of lading, or leaves it behind him after delivery from the elevator, or whether the elevator overdelivers to him,—in short, whether the deficiency or excess occurs from the carrier's neglect or without his fault,—the language of this bill of lading equally applies to it. Whatever excess he delivers the carrier is to be paid for by the consignee; i. e. he is to be paid for the excess of grain, not merely for freight on the excess. Whatever deficiency there may be he is to pay for and deduct from the freight; i. e. he is to pay the value of the grain which is not delivered, not merely to deduct the freight on the

undelivered grain. There is nothing in the bill to indicate that this special agreement shall not apply to mistakes in weighing arising, as this one apparently did, between the warehouseman and the carrier. Neither authority nor the nature of the business calls for any different construction. Similar clauses in bills of lading for similar cargoes have been before the state and federal courts.

In Meyer v. Peck, 28 N. Y. 590, and Abbe v. Eaton, 51 N. Y. 410, it was held that the words "deficiency in cargo" meant "deficiency in cargo actually received on board," and that the clause did not conclude the carrier from showing that he did not in fact take on board the full quantity stated in the bill of lading. But these cases are shorn of all authority by the later decision of the court of appeals in Rhodes v. Newhall, 126 N. Y. 574, 27 N. E. 947. The clause in that case read as follows:

"All the deficiency in cargo to be paid by the carrier, and deducted from the freight, and any excess in the cargo to be paid for to the carrier by the consignee."

The court says:

"Here the parties have provided by express language for the particular contingency arising under this contract, and we can evade its operation only by disregarding one of the most imperative rules in the interpretation of contracts. * * * It seems reasonable that parties should agree upon the quantity of grain shipped when it is designed for transportation to distant markets, with a view of avoiding controversies between carrier and consignee upon the subject. The cargo was here weighed into the vessel under the supervision and control of the carriers, and they had every opportunity to learn the actual quantity of grain received by them. They thereupon entered into a contract with the consignor, whereby it was agreed that any deficiency in the cargo should be paid for by them, and deducted from the freight, and any excess in quantity should be paid to them by the consignee. The deficiency and excess referred to could have related only to a variation from the quantity specified in the bills of lading, as there was no other standard furnished by which a variation could be estimated. This was a contract which the parties were competent to make, and a consideration for the promise to pay for any deficiency was secured by the right to collect the value of any excess. These were mutual obligations, and were obviously incurred for the purpose of avoiding disputes over the quantity actually received by the carrier, and to estop him from disputing the correctness of his acknowledgment. The parties plainly contemplated the contingency of a variance in the course of transportation between the quantity of grain admitted to have been received by them and that subsequently delivered, and provided in express terms the mode by which their respective rights should be adjusted in that event. The language of the contract is plain and unambiguous, and the right of the parties to make it is indisputable."

In Merrick v. Certain Wheat, 3 Fed. 340 (a case decided subsequently to Abbe v. Eaton, supra, and prior to Rhodes v. Newhall, supra), the United States circuit court in the Northern district of New York, Judge Wallace writing the opinion, reached the same conclusion as that expressed in the above quotation. The clause under discussion was identical with that in Rhodes v. Newhall. Of it the circuit court says:

"On first impression, it would certainly seem that the bill of lading would not contain any such stipulation if it was not intended that the deficiency provided for should be that arising from the cargo as represented by the carrier. Otherwise there would be no necessity for inserting the stipulation at all, because the consignee, without any express stipulation, has the right to deduct from the freight a deficiency in the cargo actually received by the carrier, and

arising from his fault (Davidson v. Gwynne, 12 East, 381; Sheels v. Davies, 4 Camp. 119; Edwards v. Todd, 1 Scam. 462; Leech v. Baldwin, 5 Watts, 446); and it is not reasonable to suppose that the parties meant to insert a useless condition in a contract."

Of the contract itself the court adds:

"It was a contract well calculated to prevent the constant disputes and litigation arising with reference to shortage between carrier and consignee. The carrier has an ample opportunity to guard against mistakes, and so has the shipper; but the consignee is entirely in the dark as to whether the cargo agreed to be delivered has been actually laden, or whether it has disappeared on the trip. It is just that the consignee should pay for what he actually receives, whether more or less in quantity than is expressed in the bill of lading, and it is just that the carrier should be held concluded by his admission as to facts completely within his knowledge, and of which the consignee is ignorant."

In this expression of opinion we entirely concur, and the only question left to be determined is whether the circumstance that in the cases above quoted the controversy was one between carrier and consignee, while in the case at bar it is practically between carrier and consignor, calls for a different disposition of the case. It was upon the strength of this distinction that the referee decided against the plaintiff on his claim for deficiency, holding that the contract expressed in the bill of lading did not "estop the carrier from showing that the principal [the consignor] made a mistake in which the carrier shared." There is no evidence in the record before this court tending to show that the consignor made any mistake. So far as appears, he was entirely unrepresented, except by the carrier, at the weighing from elevator to propeller at West Superior. Accepting the receipts of the carrier on the bills of lading as correctly representing the cargo laden on board under the carrier's supervision, relying upon their accuracy and on the clause in the contract, he gave up to the warehouseman, at the elevator, receipts of the latter for a quantity of grain equal to that which the carrier represented that he had received on board. All that is said in the opinion quoted from as to consignee's ignorance as to the actual quantity applies, in such a case as this, to the shipper as well. It seems reasonable that parties should agree upon the quantity of grain shipped when the grain is actually delivered to the carrier, not by the shipper out of his own storehouse, but by an independent warehouseman in another port, who delivers it on the shipper's order, and under the supervision and control of the carrier, in the absence of the shipper or his personal representative. As the language of the contract is broad enough to protect the shipper as well as the consignee against the carrier's mistake, there seems to be no good reason for restricting it as the defendant in error contends. The manner in which the carrier is to respond for such deficiency is plainly stated in the clause, "All the deficiency in cargo to be paid by the carrier, and deducted from the freight;" that is, the carrier shall pay cash for the deficiency of grain, and shall deduct from the total freight, as it appears on the bill of lading, the freight of cargo not delivered.

The judgment of the circuit court is reversed, and the cause remitted for a new trial, with costs of this court.

Application for Rehearing.

(July 30, 1895.)

Benj. H. Williams, for plaintiff in error.

John G. Milburn, for defendant in error.

LACOMBE, Circuit Judge. The point presented on this application was not overlooked. The questions whether or not there was a mistake made in weighing or tallying the grain at Superior city, and whether or not Hendry, weighmaster for the elevator, Eva, assistant state weighmaster, and Nesbitt, who tallied on behalf of the vessel, participated in that mistake, were questions of fact, and the referee's findings thereon were taken as true. Whether or not the mistake of any one of these three individuals was a mistake imputable to the owner of the grain was a conclusion of law, and if not supported by the findings of fact, nor by any evidence in the record, was properly reversed. The finding that "A. J. Sawyer & Co., the owners of the cargo, * * * honestly believed at the time the cargo was put on board * * * that there was actually on board 81,000 bushels of wheat," is not sufficient to sustain that conclusion, where the contract provides, as this does, that a deficiency between the stated quantity and that actually on board will be paid for by the vessel, and it does not appear affirmatively that the cargo owner participated in the miscount. Motion for rehearing denied.